### CINCINNATI STREET RY CO v WHITEHEAD

Ohio Appeals, 1st Dist, Hamilton Co

Decided Dec. 22, 1930

James G. Stewart, Cincinnati, for Ry Co.

Samuel Rotter, Cincinnati, for Whitehead.

ROSS, J.

It is contended on behalf of the defendant in error that it is not necessary to consider this question, as the extent of the injuries and amount of expense incurred were not developed until long after the date when such injuries were received, and that the statute runs from the date when the extent of the injuries are known and the expense is incurred. We consider such claim untenable, and hold that the statute runs from the date of the reception of the injury.

The assignment of error does, however, raise an interesting question and one which requires a careful consideration of the act of April 21, 1927, being now incorporated in the General Code as Sections 11224 and 11224-1. These sections read as follows:

"**Section 11224.** An action for either of the following causes, shall be brought within four years after the cause thereof accrued:

1. For trespassing upon real property;
2. For the recovery of personal property or for taking or detaining it;
3. For relief on the ground of fraud;
4. For an injury to the rights of the plaintiff not arising on contract nor hereinafter enumerated.

If the action be for trespassing under ground or injury to mines, or for the wrongful taking of personal property, the causes thereof shall not accrue until the wrongdoer is discovered; nor, if it be for fraud, until the fraud is discovered."

"**Section 11224-1.** An action for bodily injury or injuring personal property shall

A CORRECTION

## YOUNGSTOWN MUNICIPAL RAILWAY CO v WRIGHT

Ohio Appeals, 7th Dist, Mahoning Co

Decided June 11, 1930

The above entitled case was published in the Ohio Law Abstract for March 21, 1931 (9 Abs 359) and, in this publication, the charge of the Trial Court, upon which the error procedings were based and which was found to be erroneous was incorrectly given.

This charge is found in the second column of page 359, in the form of a quotation which reads as follows:—

"You should take into consideration, all the pain and suffering * * * brought about by the negligent conduct of this defendant company, if it was negligent at all, if the same is shown with reasonable certainty by the evidence in this case."

This quotation should read as follows:—

"You should take into consideration what loss of earnings he has endured in the past which were proximately and directly caused by the negligence of this Defendant Company, if the Defendant company was negligent in the premises. You should take into consideration the loss of earnings that will be suffered by him as to the future, if the same is shown with reasonable certainty by the evidence in this case."

## KONTNER v KENNEDY

Ohio Appeals, 4th Dist, Athens Co

Decided Mar. 20, 1931

Wooley & Rowland, Athens, for Kontner. Jones, Jones & Erskine, Athens, for Kennedy.

**BLOSSER, J.**

Error is prosecuted to this court, and the legal question presented is whether or not the trial court erred in overruling the demurrer to the petition. It is urged that Kontner, being the plaintiff and an interested party in the action before the justice, service by him as special constable was void; that his appointment as special constable was unauthorized and void and in violation of §1732 GC. The record presents an interesting question of law and one that has not been directly decided by the courts of Ohio.

Sec 1732 GC provides:

"At the request of a party, and on being satisfied that it is expedient, a justice may specially depute a discreet person of suitable age, not interested in the action, to serve summons," etc.

While courts are liberal in reviewing the proceedings of justices and other inferior courts so far as respects regularity and form, they hold them strictly within the limits of their jurisdiction as prescribed by statute. **Beebe v Scheidt, et al, 13 Oh St 415, Harding v Trustees, 3 Ohio 231, Truesdell v Combs, 33 Oh St 186.**

Kontner being the plaintiff and an interested party could not legally be deputed by the justice to serve the summons. In order to give the justice jurisdiction service must have been had on the defendant in the manner prescribed by the statute.

**1 Freeman on Judgments, Section 342,** says:

"Adequate service of process also takes cognizance of the person or officer making the same. He must be equipped with the legal authority and be empowered by statute to perform the function, otherwise his attempted service will not confer jurisdiction * * * A judgment was declared void because the action was in the name of a sheriff, tho he had no pecuniary interest therein, and the service of process was made by him."

"The general rule is that the jurisdiction of a court can never be called into exercise unless thru the medium of process, complete in law and duly served.

As a general rule certain officers are authorized to serve process and process must be directed to them, and they alone can make legal service. At common law no person but a public officer can serve process. Service of process by one not authorized to serve it is a nullity and confers no jurisdiction."
**Works on Courts and their Jurisdiction. page 252.**

"The general doctrine is that an officer can not serve process in his own case."
**Ibid, page 255.**

"Where private individuals are authorized by statute to serve process it is generally required that such person shall not be a party to the suit or interested in the result of the action. So a party to the suit can not serve his own writ.

Where it is provided that only persons not interested in the action shall be appointed to serve process service by an interested party, altho regularly appointed in all other respects, is void and confers no jurisdiction on the court."
**Ibid, page 256.**

The above doctrine is the general rule followed by the courts.

"It is the duty of a justice of the peace who authorizes a private individual to serve a summons to assure himself that such person is not interested in the case. A failure herein ousts him of jurisdiction of the case after a summons in this respect improperly served."
**Union Mutual Fire Insurance Co. v Page (Mich!), 27 N. W. 859.**

To the same effect is **Gadsby v Stimer** (Mich.), 44 N. W. 606, and **Barney v Vigoureaux, et al** (Cal.), 17 Pac. 433.

In the case of **Morton v Crane, 39 Mich. 526,** it is held:

"A constable can not serve a summons in an action in which he is plaintiff."

The opinion of the court is by Judge Cooley and on page 528 he states the reason for the rule in the following language:

"The danger of abuse in a case of a summons consists in this, that the officer may falsely make return of a service never made, and thereby put himself in a position to obtain judgment by default against a party who perhaps will hear of the proceedings for the first time when an execution appears against him. No danger of abuse from an officer serving his own process can be greater than this, and the practice

which would subject the officer to this temptation should not be tolerated. The courts generally have adhered with great propriety and justice to the rule that in no case should a man be officer and party in the same proceeding."

If there had been a mere irregularity in the process or its service the judgment may have been rendered voidable, which could have been taken advantage of by a motion to the justice to set aside the judgment or by a proceeding in error.

Kennedy not having been properly served with process according to law, the justice acquired no jurisdiction and the judgment rendered by him was void. The action of the trial court in overruling the demurrer to the petition was proper and the judgment is affirmed.

MAUCK, PJ and MIDDLETON, J, Concur.

## BOWLING v LIFE INS CO of VA.

Ohio Appeals, 6th Dist, Lucas Co.

No. 2451. Decided Dec 29, 1930

Robert A. Zanville and Samuel Kaplan, both of Toledo, for Bowling.

Doyle & Lewis, Toledo, for Ins. Co.

RICHARDS, J.

No authorities need be cited to establish the fact that in construing policies of this character, where there is any uncertainty in the interpretation of the language used, it must be construed most strongly against the insurance company, because it is the language selected and used by the company.

In earlier times the form of policy in common use appears to have been so worded as to insure against the loss of a hand or foot, without being more specific, and under a contract so worded insurance companies contended that the hand or foot was not lost unless it was severed. The courts, however, generally held that if by accident the assured was deprived entirely of the use of the hand or foot, as a member of the body, recovery could be had although the member was not severed. After the rendition of decisions of this character, various insurance companies changed the phraseology of policies subsequently issued, so as to provide only for payment in the event of loss of a hand or foot by severance at or above the wrist or ankle. This provision being specific in character, the courts have almost universally held that there could be no recovery unless there was amputation substantially as specified in the policy. A good illustration of this class of cases is **Brotherhood of Railroad Trainmen v Walsh, 89 Oh St, 15,** where the regulation of the association provided indemnity for one who should "suffer the amputation or severance of an entire hand at or above the wrist joint," and the plaintiff's hand was crushed so that it became necessary to amputate the thumb and the remainder of the hand was so injured that he was permanently disabled from using it. The Supreme Court, following the specific language used by the association, denied recovery because the contract did not contain the words "loss of hand" and specifically provided indemnity only in the event that the hand had been amputated at or above the wrist joint. In many other cases a like conclusion has been reached, where the language of the

policy was similar to that in the case just cited.

Between the two classes of cases to which reference has been made, the first being where the policy contains no language providing for the severance or removal of the hand but only for the loss of the hand and the other class where the policy provides indemnity only in the event of the severance or removal of the hand at or above the wrist, there is an intermediate class where the language is similar to that in the policy involved in the instant case, and provides indemnity in the event of "loss by severance of one hand." As stated in 1 American & English Encyclopedia of Law, 2nd Ed., 301 provisions of this character have been held to refer to the manner rather than to the exact physical extent of the injury. A leading case is that of Sneck v Travellers' Insurance Co., 34 N. Y. Supp., 545, affirmed 156 N. Y., 669. In that case the policy provided indemnity in the event of "loss by severance of one entire hand." The policy in that case was more favorable to the company than the one in the case at bar in that it used the words "entire hand" while the policy in the case at bar does not use the word "entire," and yet, in that case, a recovery was allowed. It appears from the evidence in that case that the fingers and hands of all the metacarpal bones were cut off with a planer and a little over one-half the hand was gone and that, while there are 27 bones in the skeleton of the hand, 13 bones were entirely gone and parts of 5 more, so that the entire hand had not been severed. The policy not being specific as to where the severance should occur in order to entitle a plaintiff to recover, the court held that it was reasonable to conclude that the use of the language in the policy, "the entire hand," must be considered in connection with the use to which the hand was adapted and that this was regarded by the parties as the sense in which the contract was to be understood. That case is cited in Railroad Trainmen v. Walsh, supra, with apparent approval, and its distinguishing features noted.

In Garcalon v. Commercial Travellers' Eastern Accident Association, 184 Mass., 8, the policy provided indemnity in the event of loss of one arm and also provided "that the word 'loss' as applied to arm or leg is hereby construed and agreed to mean actual amputation." The amputation was four inches below the elbow and the court held that such amputation was the loss of an arm in the common acceptation of the words and within the meaning of the policy, which did not mention whether the loss is by amputation below or above the elbow joint.

A recent case reaching the same conclusion is Life & Casualty Insurance Company v. Peacock, 124 Southern Rep. 229. The policy in that case provided indemnity in case of "loss by severance of both hands or both feet or one hand and one foot." In that case the court say that

"The provision for indemnity for 'loss by severance of feet or hands' was intended to refer to the manner rather than to the physical extent of the injury."

These cases establish the doctrine that the word "loss" as used should be construed to mean the destruction of the usefulness of the member for the purpose to which, in its normal condition, it was susceptible of application, in the absence of more specific definition in the policy.

The averments of the petition show that while only the second and third fingers were severed, it resulted in complete stiffness of the entire remainder of the hand so that the plaintiff lost the complete use of the hand.

The cases are collected in Moore v. Aetna Life Insurance Co., 75 Oregon, 47.

This court is of the opinion that the petition states a good cause of action. The judgment will be reversed and the cause remanded to the court of common pleas, with directions to overrule the demurrer to the petition and for further proceedings.

WILLIAMS and LLOYD, JJ, concur.

KNEILEY, et v KNEILEY, Admr., etc.

Ohio Appeals, 9th Dist, Summit Co

No. 1871. Decided March 24, 1931.

D. W. Baker and Chas. M. Kelly, both of Akron, for Plaintiff in error.

I. S. Ballard, Akron, for Defendant in error.

**PARDEE, PJ.**

The trial court found, upon this evidence, that the plaintiff in error could not assert her claim for dower to the prejudice of Olive Harter, the second mortgagee, basing its conclusion upon the theory of subrogation. We find, however, for the reasons hereinafter given, that we do not have to pass upon that question to render a proper judgment in this case.

Olive Harter, by her several pleadings, alleged that the plaintiff in error was estopped from asserting dower against her, by reason of the covenants set forth in plaintiff in error's separation agreement, and after reading the bill of exceptions, we think the trial court was right in finding, upon the evidence, that it would be

inequitable and unjust to allow the plaintiff in error to assert her dower rights against an innocent mortgagee who knew of said contract and relied upon it in loaning the money and taking said mortgage.

The plaintiff in error delivered said agreement to said decedent for the purposes therein stipulated. She knew or ought to have known that others besides her husband might rely thereon, and from its date until after the decedent's death she permitted it to remain outstanding as an apparent valid and enforceable contract, without taking any steps to have its purported effect nullified or destroyed. The effect of this outstanding contract was to induce innocent persons to deal with her said husband in regard to said real estate in reliance upon said agreement. By her conduct she said to the world that she had relinquished her dower in said real estate, as much as if she had been present at the time said mortgage was given, and announced that she did not claim dower. To now permit the plaintiff in error to assert that she has a dower interest in said real estate, in direct opposition to that which she had expressly declared she did not have and would not subsequently assert, would permit her to work a fraud upon one who relied upon her former written statement, solemnly proclaimed in the presence of witnesses and duly acknowledged.

"It is a well-established principle in equity, that if a person, having a right to an estate, permit or encourage a purchaser to buy it of another, the purchaser shall hold it against the person who has the right."

Smiley v Wright, et al, 2 Ohio 506, at p. 510.

"4. Where land was purchased from a husband on his wife's assurance that she and her husband had settled their property rights and that she had no further interest in such land, she was estopped from thereafter claiming dower therein."

Morgan v Sparks, 108 S.W. 233.

For the reasons stated, the judgment of the trial court is affirmed.

WASHBURN, J, and FUNK, J, concur.

## TAX COMMISSION, et v KELLY-SPRINGFIELD TIRE CO

Ohio Appeals, 8th Dist, Cuyahoga Co

Decided Jan. 31, 1931

Ray T. Miller and Neil W. McGill, both of Cleveland, for Commission.

Squire, Sanders & Dempsey, Cleveland, for Tire Co.

**LEVINE, J.**

The legal question before us is whether or not the excess credits of the Kelly-Springfield Tire Company, a foreign corporation, arising out of business transacted in the state of Ohio through its local agency are, under the particular facts in this case, taxable in the state of Ohio.

A careful perusal of **5323 GC**, above cited, discloses that, in order that property be taxed, it must appear either (1) that the property taxed shall be property in this state, or (2) that it shall be property of persons residing in the state. This is in conformity with the general rule that the property to be taxed, or the person to be taxed, must be within the jurisdiction of the taxing state. It will be noticed from a perusal of the above section of the General Code, that credits are taxable only when they are the property of persons residing in this state.

"As between different states, the situs of the property of corporations for purposes of taxation is determined by the rules which determine the situs of the property of individuals. As between the different states a corporation is considered a resident of the state in which it was incorporated, and is prima facie taxable upon its personal property in such state. A corporation may be taxed in its home state upon its tangible personal property, notwithstanding the physical absence of such property in another state, if the property itself has acquired no situs outside the state and is not subject to taxation in the place where it is situated; but it cannot be taxed on its personal property permanently located in another state. A state may tax the tangible personal property of a foreign corporation kept within its limits, which is part of the general permanent body of property within its jurisdiction and is not merely in transit through the state or temporarily staying therein. Intangible property of a corporation is taxable only in the state in which the corporation was organized, unless it has acquired a business situs elsewhere." 26 Ruling Case Law, Section 151.

It is the general rule, in the absence of controlling circumstances to the contrary,

that the situs of intangible property for the purpose of taxation is the state of the owner's domicile.

"There are decisions establishing the principle that there may be a 'business situs' of debts as distinct from the domicile of the creditor. Thus, where an agent within the state, representing a non-resident principal, is clothed with power and authority to and does create credits or loan money for his principal within the state, the agent holding an actual and effective control over the business, retaining in his own possession within the state the evidences of such debts, or producing their return to him when due for collection and return or reinvestment, the course of business being general and amounting more or less to a permanent business, then the state may by legislation separate the situs of such property for taxation from the domicile of the owner, and give it a situs within the state for purposes of taxation." 26 Ruling Case Law, Section 250.

In **Hubbard v Brush, 61 Oh St, 252,** the court recognized the above principle of law.

There can be no doubt but that the general principle is recognized in Ohio, that in determining the situs for the taxing of credits the residence of the creditor only may be considered, and that the fact that the persons from whom the debts are due reside in Ohio, cannot be considered. Thus, in **Meyer v Seaberger, 45 Oh St, 233,** in discussing the question, the court says:

"Our system of ad valorem taxation has uniformly proceeded upon the theory that tangible property is to be taxed according to the law of the place where it is situated, irrespective of the residence of its owner; while, with equal uniformity it has proceeded upon the theory that 'credits,' 'investments in bonds,' 'stocks,' etc., are taxable according to the laws of the place where their owners or holders reside.

"* * * So that it seems clear that the credits of persons not residing in this state are not the subjects of taxation by its authorities, though the debtor may reside here. Such has been the uniform policy of this state. To use the language of Welch, J., in the case above cited: 'Intangible property has no actual situs. If, for purposes of taxation, we assign it a legal situs, surely that situs should be the place where it is owned, and not the place where it is owed. It is incapable of a separate situs, and must follow the situs either of the creditor or debtor. To make it follow the residence of the latter is to tax the debtor and not the creditor.' Such has been the uniform view of the question in this /state."

From the oral argument and brief of counsel for plaintiff in error, we gather that he recognizes the general principle, but contends that, under the particular facts of the case, the Kelly-Springfield Tire Company acquired a business situs in Ohio. Counsel for both sides quote from an opinion of the Attorney General (see 1912 O. A. G., 547) wherein it was stated that:

"Credits of a non-resident corporation may be used in Ohio only when they are 'localized' by being committed to the charge and management of an agent or other representative who is more than a mere custodian or collector, and who has power to deal in a managerial capacity with the fund represented by the credit."

This statement of the Attorney General is in harmony with a number of decisions in various states which recognize the exception to the general rule and hold that a foreign corporation may acquire for purposes of taxation of its credits a "business situs." This was applied only where the owner residing in a foreign state has divorced the credits owned by him from his use, control and management, and vested it in another residing in a different state where it is used by such other person in the conduct of his business.

It remains for us merely to consider whether the particular facts in this case establish a business situs for the purpose of taxing the credits of a foreign corporation.

The facts relied upon by plaintiff in error to establish a business situs are that the Kelly-Springfield Tire Company maintains a warehouse in the city of Cleveland; employs a manager, a lady cashier and a credit manager in Cleveland, and eighteen other employees; that a large stock of merchandise is carried in Cuyahoga county; that eight salesmen are employed under the supervision of the Cuyahoga county manager; that the orders procured by the salesmen are filled largely from the stock of goods in Cuyahoga county; that the local manager can extend credit up to $500 to any one individual or company, and that under this right to extend credit there are some seven or eight hundred accounts.

It is also pointed out by the county prosecutor that while the money collected is forwarded to New York that a working fund is kept in Cleveland in the sum of $2,500, which fund is replenished from New York each week, and that the employees are paid weekly from the working fund in Cleveland.

It appears to us that it is perfectly clear, from the record, that the moment a debt is created by the act of the local manager

in extending credit, that the control and disposition of the debt is exercised exclusively by the home office of the corporation and not by the branch agency in Cuyahoga county. The local agency has no interest in the accounts receivable, nor is it permitted by the home office to utilize any of the proceeds in the conduct of the local branch. It is quite apparent from the record that these credits due from debtors residing in Ohio and contracted with the parent company through its local branch are not employed by the company in its business in Ohio, nor are those credits in any wise subject to the management or control of the local agency.

Quoting from Johnson City v Hewitt, 76 Kansas, 816, wherein the court said:

"Generally, the element of separation from the domicile of the owner, and fairly permanent attachment to some foreign locality, should appear, together with some business use of them, or some power of managing, controlling, or dealing with them in a business way. A merely transitory presence in a foreign state or a naked custody for safekeeping is not enough."

It is clear from the record in this case that there was no vesting of control and management of these credits in the local agency of the Kelly-Springfield Tire Company, and we hold that under the decisions such is necessary to the creation of a business situs for the purpose of taxing credits in the state where the debts arose.

The case of Westinghouse Electric & Manufacturing Co. v County of Los Angeles, 185 Cal., 491, presents an almost identical question as the one involved in the case at bar. In the decision the court goes into the matter at great length, and after citing the general rule that choses in action and intangible property attaches to the domicile of the owner, the court discusses the contention of the taxing officials that the credits have acquired a "business situs" in California and made them subject to taxation. The court defines the phrase "business situs" as follows:

"If we may venture to formulate a general statement of this modification of the rule it would be that this can only result where the possession and control of the property right has been localized in some independent business or investment away from the owner's domicile, so that its substantial use and value primarily attach to and become an asset of the outside business. In other words, while the non-resident may own the business, the business controls and utilizes in its own operation and maintenance the credits and income thereof."

Considering the particular facts of the present case, we conclude that the agency maintained in Cuyahoga county by the Kelly-Springfield Tire Co. is not an independent business nor an independent branch of the principal business of said company, and while it is true that the local sales agency is doing business on a fairly large scale, it is doing so through the immediate control and management of the Company's home office. The Kelly-Springfield Tire Co. in conducting this branch of its business through its local agency upon its general corporate capital for the general business of its central factory, and the credits sought to be taxed were at all times part of its general corporate assets.

We are of opinion that the particular facts of this case do not establish a business situs within the prescribed rules so as to take this case out of the operation of the general rule.

We may add that the Legislature had a clear purpose in confining taxable credits to credits of persons residing in this state. In determining excess credits the law requires that debts and obligations may be deducted from the gross amount of credits due to the person or corporation sought to be taxed.

It will be noticed further that Section 5527 defining the term "credits," permits the deduction of all claims, demands and debts whatsoever. If the credits sought to be taxed in this case were allowed to be so taxed, the benefit afforded by the statute which permits the deduction of all legal demands, claims and debts from the gross sum of credits, could not be successfully applied here. When the Kelly-Springfield Tire Co. makes a shipment of goods which are sold in Ohio on credit, it may have contracted definite debts and obligations in acquiring such property shipped by it. The taxing authorities seek in this case to allow a deduction of such debts only as are due from the Kelly-Springfield Tire Co. and which were contracted through its local agency in Ohio. When the Legislature sought to tax credits, it did not intend to lose sight of the debts and obligations which may be due from such person or corporation whose credits are sought to be taxed. Excess credits only may be taxed, as represented by the trial balance after deducting the sum total of debts and obligations from the sum total of credits due.

We are, therefore, of the opinion that the Common Pleas Court was correct in its conclusion and its judgment will be affirmed.

Without entering into a detailed statement of facts in the case of the Tax Commission of Ohio et al v The Firth-Sterling Steel Company, it is sufficient to say that a similar situation is presented, with the exception of the size of the business of the corporation which was much smaller than that of the Kelly-Springfield Company, and that the authority of the local manager was much more limited. The same question of law is involved, and our finding is to the same effect, namely, that the facts of the case presented by the record do not show the establishment of a business situs justifying the taxing of credits arising in Ohio and so as to take it out of the operation of the general rule which forbids such practice.

The judgment of the Common Pleas Court in said case is likewise affirmed.

VICKERY, PJ, and WEYGANDT, J, concur.

## SMITH v WATTERS

Ohio Appeals, 9th Dist, Summit Co
No. 1874. Decided April 6, 1931

Lee J. Myers, Akron, for Smith.
Clyde F. Beery, Akron, for Watters.

WASHBURN, J.

Although the promise to pay a commission is not contained in a written contract between the plaintiff and defendant, it is not for that reason an insufficient memorandum under the statute.

Jacobs v The Joseph E. Copp Co., 123 Oh St, 146.

Clark on Contracts, Sec. 50, p. 116.

It is contended, however, that it is not a sufficient memorandum to satisfy the requirements of §8621 GC, because no consideration for the promise is stated in the writing.

There is a considerable conflict of opinion and diversity of holding on the question whether the memorandum of a contract falling within the statute of frauds must express the consideration. The statutes of some states expressly require the consideration to be stated, and other states expressly declare that the memorandum is sufficient although the consideration is not stated. But where the question is not controlled by a specific statute on the subject, the courts of some states hold that a memorandum is not sufficient unless the consideration is stated, and the courts of other states hold that the memorandum is sufficient although the consideration is not stated, and that parol evidence is competent to prove the consideration.

In the memorandum in this case the promise of the defendant was to pay "a real estate commission" to the plaitiff, which in itself indicates that the consideration for the promise was services rendered or to be rendered in negotiating the contract of exchange of properties referred to in the contract in which the promise was made, and we think that the memorandum was sufficient because the consideration claimed appears from the writing and the surrounding circumstances to be gathered from it; but in any event, very early in the history of the state of Ohio, the Supreme Court adopted the view that the consideration need not be stated in the memorandum.

Reed v Evans, 17 Ohio 128.

That case, so far as we can find, has not been reversed or modified, but on the contrary, so far as we know, has been applied and followed by the courts of Ohio since its date in 1848.

In the opinion in the case of Duckwall v Rogers, 15 Oh St, 544, at p 546, it is specifically stated that the "consideration * * * in this state need not be stated in the writing" (citing with approval Reed v Evans, supra), and it is also therein stated that "if, however, the rule were otherwise, a consideration is clearly inferable from the face of the instrument," which, as we have pointed out, is also true in the case at bar.

We therefore hold that the memorandum in question is not insufficient because it fails to state a consideration for the promise, and that the admission of said memorandum in evidence and of the oral evidence which was offered tending to prove a consideration, was proper in this case, and that its later exclusion by the court was erroneous.

It is next contended that in fact there was no consideration for the promise contained in the memorandum in the case at bar. It is urged that the services rendered by the plaintiff were rendered without any binding agreement to pay therefor, and therefore could not constitute a consideration for the promise contained in the written memorandum; that the past performance of services constitute no consideration for an express promise, and as authority for such claim the following cases are cited:

Warner & Co. v Brua, et al, 33 Oh Ap 84

Field v Hamm, 254 Mass. 268.

Syring v Zelensky, 77 N. J. Law 406.

Stout v Lambert, 69 N. J. Law 436.

In the case of Warner & Co. v Brua, supra, there was no evidence tending to prove that the services rendered were performed at the express or implied request of the defendant, and there were no services performed after the written memorandum was signed by the party to be charged. These facts differentiate said case from the case at bar, but it is said in that case that "had there been evidence of oral contracts employing the plaintiffs, it would not have helped their position, since they would have been acting under unenforceable contracts at the time."

Where services are rendered without an express or implied promise to pay therefor and there is no legal but only a moral obligation to pay therefor, such moral obligation will not constitute a consideration for an executory promise to pay for such services. However, if services are rendered with an express or implied promise to pay therefor and such promise is not enforceable because not in writing as required by the statute of frauds, a legal obligation to pay for such services would have existed but for the statute of frauds, and as the statute does not declare the promise void but only makes it unprovable, the better rule would seem to be that under such circumstances the moral obligation to pay may constitute a consideration for a subsequently made written promise to pay, required by the statute of frauds.

But we need not determine in this case whether the statement hereinbefore quoted from Warner & Co. v Brua is a correct statement of the law, because in the case at bar there was evidence before the court that the plaintiff rendered services after the signing of the written memorandum by the defendant, which services were a necessary prerequisite to plaintiff's claim for a commission regardless of the question as to whether there was a written contract to pay commission. At the time the memorandum agreeing to pay commission was signed by the defendant, there was no binding agreement by Dales to make the exchange, and there was evidence tending to prove that after said memorandum was signed by the defendant, the plaintiff, at the instance and request of the defendant, procured Dales to sign the agreement to make the exchange, and in this particular the case at bar differs from all of the cases cited by the defendant in support of her contention.

The contract importing a consideration, and there being evidence tending to prove that, as contemplated by the parties at the time the memorandum was signed, services were rendered by the plaintiff after the signing of said memorandum by the defendant, there was before the court at the time said motion was made, some evidence of a consideration for the promise made by the defendant; and upon the motion to direct a verdict, the court was required to treat as proven all facts which the evidence tended to prove and it was error for the court to direct a verdict for the defendant and render a judgment in favor of the defendant.

Having reached this conclusion, it is unnecessary for us to pass upon the other claim made by the plaintiff, which is that at the time he asked permission to dismiss his case without prejudice, he had a right, under 11586 GC, to do so.

For error in excluding evidence and in directing a verdict and rendering judgment for the defendant, the judgment of the Common Pleas Court is reversed and the cause remanded.

PARDEE, PJ, and FUNK, J, concur.

### SWEESY v J. M. POTTER OIL CO, INC

Ohio Appeals, 9th Dist, Summit Co
No. 1947. Decided March 19, 1931

Myers, Dinsmore & Whittemore, Akron, for Sweesy.

Sheck & Stevens and N. M. Greenberger, all of Akron, for Oil Co.

as claimed, by the defendant in error, bring the proceedings within that part of 11894 GC. which provides that a receiver may be appointed in a suit—

"1. * * * by a creditor to subject property or a fund to his claim, * * * on the application of the plaintiff, or of a party whose right to or interest in the property or fund, or the proceeds thereof, is probable, and when it is shown that the property or fund is in danger of being lost, removed, or materially injured."

The appointment of a receiver is always ancillary to a principal proceeding, and under the foregoing-quoted section, the suit itself must be one to subject property to the claim of the plaintiff, on his application, and where his right to or interest in the property or the proceeds thereof is probable.

There are no allegations in this petition by which the defendant in error attempts to subject the property of the plaintiff in error to any right or interest which the defendant in error had therein. The allegations of the petition make it strictly one at law, with a prayer for a money judgment. It is true that the petition recites facts which show how the different accounts arose, all being connected with the operation of the service station which is held by the plaintiff in error under a lease from the defendant in error, but the defendant in error does not attempt to subject the leased property and its contents to its claims and is not asking any principal relief in regard to it, and does not allege or ask that any specific interest therein be found in its favor and the property disposed of in accordance therewith, but only asks that said property be taken possession of by a receiver, to be held by him until it is determined in said action at law whether said plaintiff in error is indebted to said defendant in error as claimed by it.

If this proceeding can be maintained as claimed, then in any action at law to obtain a money judgment, a receiver may be appointed for any or all property of the defendant, whether involved in the litigation or not, and there would not be much use for the attachment proceedings now provided in the civil code.

As is said in 4 Pomeroy's Equity Jurisprudence, Sec. 1539, quoted with approval by Judge Washburn in the case of **Guardian Financing Co. v Davidson, 23 Oh Ap 143,** at p 146:

"Unless authorized by statute, there is no such thing as an action brought

PARDEE, PJ.

We have carefully read this petition and examined the law cited to us by the parties interested, and we are of the opinion that this action was one at law to recover a money judgment, and that the allegations of the petition hereinbefore quoted do not,

distinctly for the mere appointment of a receiver; to justify the appointment it is essential that some proper final relief in equity be asked for in the bill which will justify the court in proceeding with the case."

The petition of the defendant in error not asking for any final relief concerning the property for which the receiver was sought and appointed, we are of the opinion that the appointment of the receiver by the Court of Common Pleas was erroneously done. The order of that court is therefore reversed and the receiver discharged; and the petition of the defendant in error not stating a cause of action justifying the appointment of a receiver, final judgment in this regard is rendered for the plaintiff in error.

WASHBURN, J, and FUNK, J, concur.

## MICELLA v STATE

Ohio Appeals, 8th Dist, Cuyahoga Co

No. 11269. Decided March 9, 1931

L. E. Appleton, Cleveland, for Micella.
Harold H. Burton, Norman A. Ryan and Stephen Gobozy, all of Cleveland, for State.

**WEYGANDT, J.**

No question is raised as to the correctness of the statutory definition nor as to the power of the General Assembly to legislate on the subject. So far as the former is concerned, it would be difficult to conceive of a more satisfactory explanation of the term. Obviously it possesses the virtues of clarity and succinctness, and it has stood the test of years—at least since 1850 when it appeared in the opinion of Chief Justice Shaw in the famous case of Commonwealth v Webster, 59 Mass. 295 at 320. The Supreme Court of Ohio cited, quoted and approved it as early as the case of **Morgan v State, 48 Oh St 370 at 377.**

The Ohio Code indicates that the section in question was patterned after Sections 1096 and 1096a of the 1927 California Penal Code which read as follows:

"Section 1096: A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether his guilt is satisfactorily shown, he is entitled to an acquittal, but the effect of this presumption is only to place upon the state the burden of proving him guilty beyond a reasonable doubt. Reasonable doubt is defined as follows: 'It is not a mere possible doubt; because everything relating to human affairs, and depending on moral evidence, is open to some possible or imaginary doubt. It is that state of the case, which, after the entire comparison and consideration of all the evidence, leaving the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge.' "

"Section 1096a: In charging a jury, the court may read to the jury Section 1096 of this Code and no further instruction on the subject of the presumption of innocence or defining reasonable doubt need be given."

It is important to note that the Ohio Legislature struck out the word "may" and inserted "shall." For this court to hold that the Legislature substituted the word "shall" for "may" with the intention that "shall" should nevertheless be read as "may" would, in the absence of conflict or ambiguity in the contest, seem clearly to require nothing less than judicial legislation.

It is further urged that although the word "shall" appears in the first part of the sentence in question, it does not appear in the latter part. However, the structure of the sentence and especially the use of the conjunctive form, make repetition of the word "shall" unnecessary. Obviously the two verbs are "shall state" and "shall read." This view is supported by the statement appearing in **12 Ohio Jurisprudence 579**, where the text writers use the following language:

"The court is now required by statute to read the statutory definition of reasonable doubt."

No reported case has been found in which the precise question was raised and decided. In the case of Davis v State, No. 10,785 in this court, the record shows that the trial court gave the statutory definition as requested, but before so doing made the statement that the charge already given was a better one. It was contended that this was prejudicial error. The conviction was affirmed, and the Supreme Court overruled the motion to certify November 20, 1930.

The final contention of the prosecution is that the refusal of the trial court resulted in no prejudice to plaintiff in error inasmuch as an instruction had already been given to the jury on the subject of reasonable doubt. A study of the court's somewhat lengthy charge shows that it did not completely cover the entire substance of the brief statutory definition. Undoubtedly one of the things the legislature had in mind was the distinct advantage of a carefully worded charge as brief and simple as consistent with accuracy. The greater the length of a charge, the greater the danger that it may be confusing rather than helpful to jurors. Then, too, it sometimes happens that a charge contains language by no means choice, but nevertheless not prejudicially erroneous. There is danger that such language may

be mistakenly construed as highly satisfactory, and even used as a model charge just because it has been tolerated by the reviewing courts. The General Assembly has rendered a distinct service by providing a definition sanctioned by both legislative enactment and judicial pronouncement. Since the legislature has taken care to confer upon a party the right to have this particular instruction given, the courts cannot say that there is no substantial error in a denial of the right.

The judgment is reversed and the cause remanded for further proceedings according to law.

Levine, PJ, concurs.

(Vickery, J, not participating).

———

be brought within two years after the cause thereof arose."

The provision of limitation in §11224-1 applies to two species of injury—"bodily injury" and "injuring personal property."

If the cause of action of the husband for loss of services is "an action for bodily injury," it was barred when the petition was filed; and if "an action * * * for injuring personal property" it is barred.

It has been held by the Supreme Court that a statute of limitation affects the remedy and not the cause and applies to all causes coming within its terms upon which actions have not been commenced. **Smith v N. Y. C. R. R., 122 Oh St, 45, 170 N. E., 637.**

First, was this an action for "bodily injury"? We think it manifest that the statute referred to a direct action for bodily injury and not an action for consequential injury to a third-person. A case raising a similar question is to be found in Hey v Prime, 197 Mass., 474, 17 L. R. A (N. S.), 570. In the opinion the court say:

"But, where the husband also brings suit, because the disability arising from the tort has deprived him of either her services, or matrimonial companionship, his right to recover rests upon the ground that the wrong suffered by him, while personal in effect, is regarded as purely consequential in character. Barnes v Hurd, 11 Mass., 59; Kelley v New York, N. H. & H. R. Co., 168 Mass., 308, 311, 38 L. R. A., 631, and 60 Am. St. Rep., 397, 46 N. E., 1063."

The same distinction between direct and consequential injuries is made in Section 466, "Husband and Wife", 13 R. C. L., pp. 1418 and 1419, where it is stated:

"It has, moreover, been held that such an action is not saved by a statute providing that 'actions * * * of tort for assault, battery, imprisonment, or other damage to the person * * * shall not abate by death', as the language 'other damages to the person' includes such damages only as result from direct bodily injury but excludes consequential damages suffered by those who are injured from a wrongful interference with their rights, and where a husband sued because the disability to the wife arising from the tort has deprived him either of her services or companionship, his right to recover rests on the ground that the wrong suffered by him, while personal in effect, is regarded as purely consequential in character."

We hold therefore that the instant case is not an action for bodily injury.

Second, is this an action for "injuring personal property"?

All property is divided into two general classes—real and personal. **Ralston Steel Car Co. v Ralston, 112 Oh St, 306, p. 314;** 50 Corpus Juris, 743, Vol. 1; Cooley's Blackstone, 3d Ed., p. 328.

"The term 'personal property' has, in law, a distinct technical meaning, which relates to the nature of the property itself and distinguishes it from real property. The term has been defined as goods, money, and all other movables which may attend the person of the owner wherever he may think proper to go, which is the definition given by Blackstone of "things personal," or as goods and chattels. The term has also been defined as the right or interest which a man has in things personal, or any rights or interest which he has in things movable, or the right or interest less than a freehold which a man has in realty. Too, the term 'personal property' is used to apply both to the thing itself and the right or interest of the owner therein." Sec. 32, 50 Corpus Juris, p. 759.

And again:

"Although popularly the term 'personal property' is used in a somewhat restricted sense to include only goods and chattels. tangible things, the subjects of personal use, in its broad and general sense it includes everything which is the subject of ownership not coming under the denomination of real estate; and all subjects of property not of a freehold nature, nor descendible to the heir at law, are personal property. The term has been held to include intangibles as well as tangibles, but it may sometimes be used to apply only to tangibles." Sec. 36, p. 760, Id.

It may be said in passing that while a chose in action is personal property,

whether it arises ex contractu or ex delicto (Cincinnati v Hafer, 49 Oh St, 60, 65) the injury complained of was not an injury to a chose in action but created a right of action after the injury occurred.

The broad definition of personal property is given in 22 R. C. L., p. 63, Section 38:

"In its general or ordinary significance, the term 'personal property' embraces all objects and rights which are capable of ownership except freehold estates in land, and incorporeal hereditaments issuing thereout or exercisable within the same. The term is frequently declared by statute to be co-extensive with money, goods, chattels, things in action, evidence of debt, and money. Other statutes specify with great detail what shall be included within the meaning of the term."

Employing the broad technical meaning, the term "personal property" in §11224-1, GC, is broad enough to include the right of the husband to his wife's services, but it' is obviously broad enough, if so construed, to include the rights set out in §11224, and if the term as used in §11224-1 is given such broad and technical construction, we will have a two and four year limitation covering the same actions. Paragraph 4, §11224 does not help us, for §11224-1 "hereinafter mentioned" if broadly construed would, as pointed out, include the rights specified in paragraphs 1, 2, and 3.

But there is help in §11224, for in that section in paragraph 2, the term "personal property" is patently given a distinctly limited meaning. An action for "the recovery of personal property" or the "taking or detaining" it, must refer to chattel property—tangible property—as distinguished from incorporeal rights. The Legislature having used a term more than once in the very same act can hardly be charged with using it in one sense in one place and in a much broader and more technical sense in another section. It is also a well established rule of statutory construction that where one intent from the language used gives effect to two apparently conflicting sections, and another intent renders these contradictory, that the language will be construed if possible so as to give effect to both sections.

We are of opinion that the Legislature, in §11224-1, intended a limitation on actions for injury to tangibles—chattel property as distinguished from actions for the violation of rights in or to personal property, or arising out of injury thereto.

By such construction, paragraph 4, §11224, GC, is given full force and effect and ap-

plies to the instant case.

The instant cause therefore not arising on contract, being an action in tort for negligent injury of the wife, consequently depriving the husband of the wife's services and consortium, and not being an action enumerated in the succeeding sections is not barred until four years after the injuries were received, and the petition herein was filed in time.

The judgment is affirmed.

HAMILTON, J, concurs.